******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RASHAD MOON
## (AC 42130)

Lavine, Elgo and Pellegrino, Js.

*Syllabus*

Convicted of the crimes of felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree, the defendant appealed. The defendant's conviction stemmed from an incident in which the defendant and M attempted to rob the victim, F, of two computer tablets he had advertised for sale via an internet posting. Upon meeting the defendant and M to sell the tablets, F was shot while he was sitting in his car near the defendant's home and, subsequently, died from his injuries. On appeal, the defendant claimed, inter alia, that the trial court erred in providing the jury with a supplemental instruction regarding the use of force element of robbery in response to a question from the jury. *Held:*

1. The court did not err when it provided the jury with a supplemental instruction in response to its question regarding the use of force element of robbery in the first degree: the defendant's claim that the court introduced a new theory of liability, namely, accessorial liability, when it added the phrase "another participant" to the instructions on the use of physical force element of robbery in the first degree was unavailing, as the statute (§ 53a-134 [a]) governing robbery in the first degree, which provides that a person may be guilty of robbery in the first degree if he or another participant in the crime uses or threatens the use of a dangerous instrument, provides for both principal and accessorial liability, and, thus, the court, by adding the phrase "another participant," tailored the instruction so that it more closely mirrored the statute, and its supplemental instruction was adapted to the state's theory of the case that the defendant was a participant in the robbery; moreover, the supplemental instruction did not invade the province of the jury or suggest a preferred verdict, as it appropriately clarified an element of an existing charge against the defendant, was a proper statement of the law and used permissive language, which made it clear that the court was not instructing the jury to find that the defendant was a participant in the robbery.

2. The defendant could not prevail on his claim that the court erred when it declined to poll the jurors on his affirmative defense to the felony murder charge, which was based on his claim that the applicable rule of practice (§ 42-31) requires the court to poll jurors on affirmative defenses, as the mandatory language of that provision expressly provides that the rule applies only to the jurors' verdict: where, as here, the court did not direct the jury to return any verdict other than a general one, the court was required only to poll the jurors concerning whether they found the defendant unanimously guilty or not guilty of the charges against him and not whether they found that he had proved the affirmative defense, and because the jury instructions made clear that, to find the defendant guilty of felony murder, the jury had to find, unanimously, that he did not prove the affirmative defense, the clerk, in polling the jurors on felony murder, necessarily polled them on the affirmative defense; moreover, requiring that jurors be polled regarding the affirmative defense was analogous to providing the jurors with interrogatories, which was not generally recognized as a part of Connecticut's criminal procedure.

3. The trial court did not abuse its discretion by admitting into evidence two spent shell casings that were found in the defendant's house two days after the shooting; although the defendant claimed that because there was no connection between the shell casings and the shooting, the casings were impermissible evidence of his criminal propensity, the state introduced evidence connecting the shell casings to the shooting death of the victim, including testimony that the shell casings came from a .22 caliber gun, a statement from a witness that the witness had seen the defendant with a .22 or .25 caliber gun, and testimony that the victim's wound was consistent with the type of wound created by a

bullet fired from a small caliber gun, and the shell casings were relevant to the crime charges because they had a tendency to prove that the defendant owned a firearm and, therefore, had the means to commit a crime involving a small caliber gun.

4. The defendant could not prevail on his unpreserved claim that the trial court improperly instructed the jury on conspiracy to commit robbery in the first degree when it omitted the intent element required for the underlying crime of robbery in the first degree by failing to instruct the jury that it had to find that the defendant intended to commit a robbery while he or another participant was armed: because the court provided counsel with a meaningful opportunity to review the jury instructions when it gave the parties a copy of the proposed jury instructions two days prior to instructing the jury, defense counsel did not express any concerns regarding the instructions on conspiracy to commit robbery in the first degree and stated that the defendant did not need more time to review the proposed jury instructions, and defense counsel failed to object after the court instructed the jury on conspiracy, the defendant waived his instructional claim; moreover, the defendant's claim that the court's instruction on conspiracy to commit robbery in the first degree constituted plain error was unavailing, as the court instructed the jury on the intent requirement for conspiracy to commit robbery in the first degree when it read from the conspiracy statute and set forth the elements of the crime, and it provided the jury with detailed instructions on the intent element of conspiracy to commit robbery in the first degree, which made clear that the intent required for the charge was the intent to commit the underlying crime of robbery in the first degree and that the defendant had to intend for a participant in the crime to be armed with a deadly weapon.

Argued April 11—officially released August 27, 2019

*Procedural History*

Information charging the defendant with the crimes of felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree, brought to the Superior Court in the judicial district of Hartford, geographical area number fourteen, and tried to the jury before *Baldini, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David L. Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PELLEGRINO, J. The defendant, Rashad Moon, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2). On appeal, the defendant claims that the trial court improperly (1) instructed the jury on accomplice liability, (2) failed to poll the jurors on the defendant's affirmative defense, (3) admitted into evidence two spent shell casings that were unconnected to the crime, and (4) instructed the jury on conspiracy to commit robbery in the first degree without instructing it on the intent required for robbery in the first degree. We disagree and, accordingly, affirm the judgment of the trial court.

On the basis of the evidence adduced at trial, the jury reasonably could have found the following facts. In May, 2013, the victim, Felix DeJesus, and his fianceé posted two T-Mobile Springboard tablets for sale on Craigslist. The Craigslist posting stated that the tablets were being sold for $300 each or $500 for both of them and included the victim's phone number. On May 8, 2013, at approximately 7 p.m., a prospective buyer of the tablets called the victim. The prospective buyer said that he did not have a car and asked the victim to meet him in Hartford so that he could purchase the tablets. The victim agreed to travel to Hartford and, shortly after 7 p.m., the victim left his home in Cromwell with the tablets.

At approximately 7:45 p.m., a resident of the neighborhood where the crime occurred, Gloria Therrien, observed the victim park his car in front of 16 Allendale Road. From inside her home, Therrien saw two men approach the car and stand at its driver's side window. One of the men spoke to the victim through the front driver's side window while the other man stood next to him. Therrien heard a gunshot and saw the two men run away from the car, using a cut through that connected Allendale Road to Catherine Street. Therrien then went outside and walked toward the victim's car. She observed that the car windows were open and that the victim was in the driver's seat of the car "jerking . . . and gurgling." Therrien asked some children who were nearby to call 911 and report that someone had been shot.

The police arrived at the scene at approximately 8 p.m. When Jeffrey Moody, an officer with the Hartford Police Department (department), arrived, he saw the victim's car and noticed that its engine was running and that the victim was inside. Moody approached the car and found the victim unresponsive. Thereafter, emergency services took the victim to Hartford Hospi-

tal, where he died of a single gunshot wound to the head at approximately 3:46 a.m.

Chris Reeder, a detective with the department, arrived at the scene at approximately 8:30 p.m., after the victim had been taken to Hartford Hospital. Reeder searched the interior of the victim's car and found a T-Mobile Springboard Tablet and a white Samsung cell phone. The police took possession of both items.

On May 9, 2013, the police extracted data from the cell phone, which they determined had belonged to the victim. The data extracted from the cell phone included a series of text messages and phone calls between the victim and a cell phone number that belonged to Marvin Mathis, an individual who resided near the scene of the crime. Around the time of the murder, there were text messages between Mathis and the victim in which Mathis instructed the victim to meet him at 16 Allendale Road.

That same day, Reeder went to speak with Mathis at his home on Allendale Road. Mathis denied having any knowledge of the shooting and stated that he was asleep at home when the crime occurred. Mathis also stated that he was with the defendant from approximately 6 to 7:30 p.m. on the night of the shooting and that while they were together, the defendant borrowed his phone.

Mathis allowed Reeder to view his cell phone and the text messages on the device. The text messages on Mathis' cell phone matched the text messages that the police had extracted from the victim's cell phone. Mathis, however, denied sending the messages and stated that the defendant must have sent them. Reeder also observed that the call log on Mathis' cell phone revealed that, at approximately the time of the shooting, there were calls between Mathis and the defendant. On May 8, 2013, there were calls between the defendant and Mathis at 6:02, 7:51, 7:52 and 9:53 p.m.

On May 12, 2013, Reeder spoke with the defendant and the defendant's girlfriend, Brittany Hegwood. Hegwood informed the police that on the night of the shooting, she witnessed Mathis and the defendant walk "down Catherine Street toward Hillside [Avenue]" together and that when the defendant returned approximately five minutes later he stated "[Mathis] just shot somebody."

The defendant also provided the police with a statement in which he admitted that he was with Mathis on the night of the shooting and that he went with Mathis to meet the victim. The defendant stated that Mathis told the defendant that he was going to buy "some stuff" from the victim. The defendant further stated that he stood approximately thirty feet away from the victim's car while Mathis spoke with the victim through the driver's side window. The defendant stated that he looked away from Mathis and heard a gunshot, at which

point he and Mathis ran away from the car to the defendant's house on Catherine Street.

As part of their investigation, the police obtained a search warrant for the defendant's cell phone records. The defendant's cell phone records revealed calls between the defendant and a phone number belonging to an individual by the name of Jahvon Thompson on May 10 and 14, 2013.

On May 23, 2014, approximately one year after the shooting, Thompson, who was under arrest at the time, spoke with Reeder. Thompson informed Reeder that he and the defendant initially had planned to rob the victim because they "were broke." Thompson further stated that "a day or two" before the crime he, the defendant, and Mathis were together and that the defendant was texting the victim on Mathis' phone. Thompson stated that ultimately he did not participate in the robbery because "something came up."

Additionally, in May of 2014, an individual by the name of Tyrell Hightower left three messages on a police tip line, in which he indicated that he had information about a homicide that had occurred on Allendale Road one year earlier. On June 2, 2014, Reeder met with Hightower at Hartford Correctional Center, where Hightower was incarcerated. During the meeting, Hightower informed Reeder that the defendant had confessed to him that he and Mathis were involved in the murder of the victim. Hightower further stated that the defendant had informed him that it was a "robbery that went bad" and that Mathis had shot the victim.

In late June of 2014, the police arrested the defendant. After a jury trial, the defendant was convicted of felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree. The court sentenced the defendant to a total effective sentence of forty-nine years of incarceration. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that "[t]he trial court committed harmful error when, for the first time during deliberations, [in response to a question from the jury] it instructed the jurors that [the] defendant could be convicted of robbery even if another person was the one to use force . . . ." The defendant argues that the court's supplemental instruction suggested a verdict in favor of the state, deprived him of the opportunity to defend against this theory of liability and violated his right to have the jurors properly instructed on the law. We disagree.

We begin with the applicable standard of review and the legal principles relevant to this claim. "[I]ndividual jury instructions should not be judged in artificial isolation . . . but must be viewed in the context of the

overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury. . . . A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Berrios*, 187 Conn. App. 661, 705–706, 203 A.3d 571, cert. denied, 331 Conn. 917, 204 A.3d 1159 (2019). This standard of review also applies to supplemental instructions. *State* v. *Miller*, 36 Conn. App. 506, 515, 651 A.2d 1318, cert. denied, 232 Conn. 912, 654 A.2d 357 (1995).

Practice Book § 42-27 provides: "If the jury, after retiring for deliberations, requests additional instructions, the judicial authority, after providing notice to the parties and an opportunity for suggestions by counsel, shall recall the jury to the courtroom and give additional instructions necessary to respond properly to the request or to direct the jury's attention to a portion of the original instructions."

The following additional facts and procedural history are relevant to this claim. Count two of the information charging the defendant alleged: "[O]n or about May 8, 2013 at 8:00 p.m. on Allendale Road in Hartford . . . while in the course of the commission of a robbery and in immediate flight therefrom, [the defendant] or another participant in the crime was armed with a deadly weapon."

During closing argument, the state argued that the defendant was one of the two participants in the robbery and that it was legally irrelevant whether he or Mathis shot the victim. The prosecutor stated: "The one issue you have to analyze . . . is was [the defendant] a participant in the robbery . . . ."

After closing arguments, the court instructed the jury on the law relevant to the case, including the charge of robbery in the first degree.[1] The court began its instruction on robbery in the first degree by providing: "The defendant is charged in count two with robbery in the first degree in violation of General Statutes § 53a-134 (a) (2). The statute defining this offense reads in pertinent part as follows: A person is guilty of robbery in the first degree when in the course of the commission of the crime of robbery, or immediate flight therefrom,

he, or another participant in the crime, is armed with a deadly weapon."

The court stated the following with regard to the elements of robbery: "[T]he following are elements of robbery: (a) that the defendant was committing a larceny; (b) that the larceny was accomplished by the use, or threatened immediate use, of physical force upon another person; (c) for the purpose of preventing or overcoming resistance to the taking of the property, or to the retention thereof immediately after the taking, or compelling the owner of such property or another person to deliver up the property."[2]

Under the heading "(b) Use or Threat of Use of Physical Force," the court provided: "The second element of robbery is that the larceny was accomplished by the use or threatened use of physical force."[3]

Under the heading "conclusion," the court provided: "In summary, the state must prove beyond a reasonable doubt the following elements of robbery in the first degree: (1) the defendant was committing a larceny, and (2) that he used physical force or threatened the use of physical force for the purpose of preventing or overcoming resistance to the taking of property or to the retention of property immediately after the taking or compelling the owner of the property or another person to deliver up the property or to engage in other conduct that aids in the commission of larceny; and (3) that in the course of the commission of the robbery or immediate flight from the crime, the defendant or another participant in the crime was armed with a deadly weapon."[4] (Emphasis added.)

The court provided the jurors with a paper copy of the jury instructions for their use during deliberations. During deliberations, the jury sent the court the following note: "Does 'the use or threat of use of physical force' element of robbery in the first degree require a finding that the defendant personally used or threatened the use of force or is it sufficient as to the 'use or threat of use of physical force' element if, in the course of the larceny, force was threatened by any party to the larceny?

"*Explanation.* The conclusion on [page] 17 of the jury charge says '(2) that *he* used physical force or threatened the use of physical force.' On [page] 13, element I and [page] 15, section (b) use or threat of use of physical force, it says . . . 'that the larceny *was accomplished by* the use or threatened immediate use, of physical force upon another person.'" (Emphasis in original.)

Upon receiving the note from the jury, the court discussed the matter with counsel. Although the court stated that it believed that the instruction on robbery in the first degree was proper, it nonetheless proposed responding to the jury's note by adding the phrase

"another participant" to the use of force instruction on pages 15 and 17. The court explained that it was its belief that the addition of this language would clarify that the jury could find the defendant guilty of robbery in the first degree if he or another participant in the crime used or threatened the use of physical force.

Defense counsel objected, stating that the proposed clarification would serve as an "unfair invasion of the province of the jury" and improperly introduce the concept of accomplice liability. Defense counsel argued that the original instruction properly stated the law and that there was nothing the court needed to clarify or correct. Instead of providing the jury with additional clarifying instructions, defense counsel proposed rereading the original instructions or, alternatively, adding the proposed language and rereading the entirety of the instructions.

Over the defendant's objection, the court decided to provide the jury with the proposed clarification. The court explained that pursuant to *State* v. *Davis*, 255 Conn. 782, 791 n.8, 772 A.2d 559 (2001), it did not need to separately instruct on accessorial liability for robbery in the first degree because the statute, on its face, extends to principals and accessories. Furthermore, the court stated that it believed simply rereading the charge would not respond to the jury's question.

The court called the jury to the courtroom and stated: "First, I believe that the instruction that I have given you on page 13 is the correct recitation of the law. I further believe that the law that I instructed on page 15 and page 17 is also the correct recitation of the law. I do want to give you, by point of clarification, language that you can consider which would be consistent with all of the instructions that I gave you. With regard to page 15, under paragraph (c) 'Purpose of use of force.'[5] You may consider another participant of the crime. So the language would enable you to consider, if you find that the defendant *or another participant* of the crime used physical force or threatened . . . immediate use of force in committing a larceny you must then determine whether such physical force was used or threatened for the purpose of and the language continues from there. . . .

"On page 17, consistent with the instructions that I gave you, and the clarification that I just gave you, under 'conclusion,' under paragraph two the law allows you to consider another participant in the crime. The language under the conclusion by way of clarification, therefore, enables you to consider that he, meaning the defendant, *or another participant* in the crime used physical force or threatened the use of physical force for the purpose of preventing or overcoming resistance to the taking of property, or to the retention of property immediately after the taking or compelling the owner of the property or another person to deliver up the

property or to engage in other conduct that aids in the commission of larceny." (Emphasis added.)

On appeal, the defendant concedes that the court was required to address the jury's question, but argues that the supplemental instruction improperly introduced a new theory of liability, namely, accessorial liability.[6] In support of his argument, the defendant cites numerous cases from other jurisdictions, which, he argues, demonstrate that it is error for a court to introduce a different theory of liability, and in particular accessorial liability, for the first time in a supplemental instruction. See, e.g., *United States* v. *Gaskins*, 849 F.2d 454 (9th Cir. 1988); *People* v. *Millsap*, 724 N.E.2d 942 (Ill. 2000); *People* v. *Jamison*, 566 N.E.2d 58 (Ill. App. 1991); *State* v. *Hover*, 362 P.3d 1125 (Kan. App. 2015); *State* v. *Johnson*, 795 S.E.2d 171 (S.C. App. 2016); *State* v. *Ransom*, 785 P.2d 469 (Wash. App. 1990). In citing these cases, the defendant presupposes that the court, introduced a new theory of liability when it added the phrase "another participant" to the instructions on the use of physical force element of robbery in the first degree. We disagree.

General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he *or another participant in the crime* . . . (2) is armed with a deadly weapon . . . ." (Emphasis added.) The plain language of the statute states that an individual may be guilty of robbery in the first degree if he or another participant in the crime uses or threatens the use of a dangerous instrument. In *State* v. *Davis*, supra, 255 Conn. 791, n.8, our Supreme Court concluded that § 53a-134 applies to both principals and accessories, stating: "[O]ur robbery statute, § 53a-134, includes explicit accessory language within the text of the statute. . . . Because the robbery statute applies to principals *and* accessories on its face, the court did not need to explain the concept of accessorial liability to the jury as it relates to the robbery charge." (Emphasis added.) Our Supreme Court also noted that our law makes no "practical distinction between the terms 'accessory' and 'principal' for the purposes of determining criminal liability." Id., 789.

The defendant argues that *Davis* does not control in the present case because it is factually distinguishable. The defendant points to the fact that the court in *Davis* instructed on accessorial liability with regard to another statute, whereas the court in the present case did not instruct on accessorial liability at all. The lack of such an instruction with regard to another charge in the present case, however, is not a significant distinction because § 53a-134 provides for both principal and accessorial liability. *Davis* recognized this, stating that an accessory instruction with regard to robbery in the

first degree was unnecessary because the robbery statute "includes explicit accessory language within the text of the statute." Id., 791, n.8. Thus, we conclude that the defendant's efforts to distinguish *Davis* are unavailing.

Moreover, even if we assume that *Davis* is distinguishable, other cases from our appellate courts recognize that § 53a-134 applies to both principals and accomplices. *State* v. *Crump*, 201 Conn. 489, 495, 518 A.2d 378 (1986) (concluding "fact that the defendant was not formally charged as an accessory does not preclude his being so convicted" and defendant could be convicted of robbery because evidence supported "conclusion of the trial court of the defendant's complicity as either a principal or an accessory"); *State* v. *Harper*, 184 Conn. App. 24, 32, 194 A.3d 846 ("the offense of robbery in the first degree in violation of § 53a-134 [a] [2] does not require proof that a defendant intended to possess a deadly weapon"), cert. denied, 330 Conn. 936, 195 A.3d 386 (2018); *State* v. *Latorre*, 51 Conn. App. 541, 552, 723 A.2d 1166 (1999) (evidence was sufficient to convict defendant of robbery, despite lack of instruction on accomplice liability, because defendant acted in concert with another).

In the present case, because § 53a-134 provides that a defendant can be found guilty in the first degree if he or another participant in the crime uses force, the court, by adding the phrase "another participant," tailored the instruction so that it more closely mirrored the statute. Additionally, the court's supplemental instruction was adapted to the state's theory of the case. Throughout trial, the state's theory of the case was that the defendant was a participant in the robbery. The state explicitly so stated during closing argument when it repeatedly argued that it was legally irrelevant whether the defendant or Mathis shot the victim because there was ample evidence that the defendant was a participant in the crime and had conspired with the defendant to plan the robbery. Specifically, the state argued: "Who actually killed [the victim] is not important. . . . You don't need that issue to resolve the elements of the charges that you have before you."

Finally, we are unpersuaded by the defendant's argument that the supplemental instruction invaded the province of the jury or suggested a preferred verdict. In support of this argument, the defendant cites to the concurrence in *State* v. *Devoid*, 188 Vt. 445, 453–54, 8 A.3d 1076 (2010). *Devoid*, however, is factually distinguishable from the present case in that it involved a supplemental instruction that introduced the crime of attempt when the defendant had not, in any way, been charged with attempt. Id. Furthermore, the court in *Devoid* noted that the supplemental instruction did *not* clarify an element of an existing charge, which would have been within the trial court's discretion. Id., 455.

By contrast, the supplemental instruction in the present case appropriately clarified an element of an existing charge against the defendant. Moreover, the supplemental instruction in the present case was a proper statement of the law. *State* v. *Turner*, 181 Conn. App. 535, 571, 187 A.3d 454 (declining to review claim that legally correct response to jury question intruded on function of jury), cert. granted on other grounds, 330 Conn. 909, 139 A.3d 48 (2018). Finally, the supplemental instruction in the present case used permissive language, making it clear that the court was not instructing the jury to find that the defendant was a participant in the robbery.[7]

On the basis of the foregoing, we conclude that the court did not err when it provided the jury with a supplemental instruction in response to its question regarding the use of force element of robbery in the first degree.[8]

II

The defendant's second claim is that the court erred by refusing to poll the jurors on the affirmative defense to felony murder. The defendant argues that the court's refusal to poll the jurors on the affirmative defense to felony murder violated Practice Book § 42-31 and his right to a unanimous verdict. We disagree.

We begin with the applicable standard of review and the legal principles relevant to this claim. "The interpretation and application of a statute, and thus a Practice Book provision, involve a question of law over which our review is plenary. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Citation omitted; internal quotation marks omitted.) *Garvey* v. *Valencis*, 177 Conn. App. 578, 583, 173 A.3d 51 (2017).

Practice Book § 42-31 provides: "After a verdict has been returned and before the jury has been discharged, the jury shall be polled at the request of any party or upon the judicial authority's own motion. The poll shall be conducted by the clerk of the court by asking each juror individually whether the verdict announced is such juror's verdict. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or it may be discharged."

The following additional facts and procedural history

are relevant to this claim. On December 2, 2016, after closing arguments, the court instructed the jury on the elements of felony murder: "One, that the defendant with one or more . . . other persons committed the crime of robbery. Two, that the defendant or another participant in the crime of robbery as instructed caused the death of another person. Three, that the defendant or another participant caused the death while in the course of and in furtherance of the commission of the crime of robbery or an immediate flight therefrom. . . . If you unanimously find that the state has proved all elements, as I've instructed you, beyond a reasonable doubt, your verdict would be guilty to one count felony murder."

Immediately thereafter, the court instructed the jury on the affirmative defense to felony murder, stating: "The evidence in this case raises what the law calls an affirmative defense. This affirmative defense applies only to count one felony murder. An affirmative defense constitutes a separate issue or circumstances that mitigate the degree of or eliminate[s] criminality or punishment. . . .

"For you to find the defendant not guilty of this charge the defendant must prove the following elements by a preponderance of evidence. . . .

"The first element is the defendant did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid in the commission of it. . . .

"The second element is that the defendant was not armed with a deadly weapon or any dangerous instrument. . . .

"The third element is that the defendant had no reasonable grounds to believe that any other participant was armed with such a weapon or instrument. A reasonable ground to believe means that a reasonable person in the defendant's situation viewing the circumstances from the defendant's point of view would have shared that belief. . . .

"The fourth element is that the defendant had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

On December 5, 2016, the court informed the parties that the jury had reached its verdict. Defense counsel asked the court to poll the jurors "with respect to each count as well as with respect to the affirmative defense [to the charge of felony murder]." The state's attorney stated that he did not see any reason for the jurors to be polled on the affirmative defense. In response, defense counsel argued that it was proper to poll the jurors on the affirmative defense because they had been instructed that the affirmative defense requires unanimity. The court concluded that the jury would be polled only with regard to the three counts charged and not

the affirmative defense because the defendant had not previously submitted a request for the jury to be polled on the affirmative defense and because "the verdicts whatever they may be will resolve the issues with regard to the affirmative defense."

The jury foreperson stated when polled by the clerk that the jury had found the defendant guilty of felony murder, robbery in the first degree and conspiracy to commit robbery in the first degree. The clerk of court accepted the verdict and polled each juror individually with regard to the three counts. Each juror stated that he or she had found the defendant guilty of felony murder, robbery in the first degree, and conspiracy to commit robbery in the first degree.

The defendant argues that Practice Book § 42-31 requires the court to poll jurors on affirmative defenses. Although the defendant argues that "verdict announced" includes affirmative defenses, he has failed to direct our attention to any support for this assertion. Indeed, the mandatory language of the provision expressly provides that the rule applies only to the jurors' verdict. Moreover, in *State* v. *Pare*, 253 Conn. 611, 617, 755 A.2d 180 (2000), the case on which the defendant relies in support of his assertion that the court was required to poll the jury on the affirmative defense, the court did *not* take issue with the trial court's failure to poll the jurors on the defense of extreme emotional distress. Although the court in *Pare* concluded that the trial court committed reversible error when it failed to poll the jurors, the basis of its conclusion was the court's failure to poll each juror individually, not the court's failure to poll the jurors with regard to the defense of extreme emotional distress. Id., 638. By contrast, in the present case, the clerk individually polled each juror with regard to all three of the charges against the defendant.

Moreover, requiring that jurors be polled regarding the affirmative defense is analogous to providing the jurors with interrogatories, which is not generally recognized as a part of Connecticut's criminal procedure. See Practice Book § 42-29 ("[t]he verdict shall be general unless otherwise directed by the judicial authority, but if the judicial authority instructs the jury regarding the defense of mental disease or defect, the jury, if it so finds, shall declare the finding in its verdict"); *State* v. *Anderson*, 158 Conn. App. 315, 333, 118 A.3d 728 ("we will not probe into the logic or reasoning of the jury's deliberations or open the door to interminable speculation"), cert. granted, 319 Conn. 907, 123 A.3d 438 (2015) (appeal withdrawn on May 5, 2015), and cert. granted on other grounds, 319 Conn. 908, 123 A.3d 437 (2015) (appeal withdrawn May 4, 2016); *State* v. *Blake*, 63 Conn. App. 536, 543–44, 777 A.2d 709 (concluding trial court properly denied defendant's request to submit to jury interrogatory on affirmative defense), cert.

denied, 257 Conn. 911, 782 A.2d 134 (2001). In the present case, because the court did not direct the jury to return any verdict other than a general one, the court was required only to poll the jurors on whether they found the defendant unanimously guilty or not guilty of the charges against him and not whether they found that the defendant had proved the affirmative defense.

Finally, the jury instructions made clear that, in order to find the defendant guilty of felony murder, the jury had to find, unanimously, that the defendant did not prove the affirmative defense. "[I]t is well established that, [i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *Hurley* v. *Health Physicians, P.C.*, 298 Conn. 371, 401, 3 A.3d 892 (2010). The defendant does not argue that the jury failed to follow any instructions, therefore, we must assume that the jury followed the court's instructions on felony murder. Because the court instructed the jury that it had to find that the defendant did not satisfy the elements of the affirmative defense before finding the defendant guilty of felony murder, the clerk, in polling the jurors on felony murder, necessarily polled them on the affirmative defense.

On the basis of the foregoing, we conclude that the court did not err when it declined to poll the jurors on the affirmative defense.

III

The defendant's third claim is that the court abused its discretion by admitting into evidence two spent shell casings that were unconnected to the shooting. The defendant argues that the court's error allowed the jury to assume that the defendant was a violent person who must have possessed the murder weapon. We disagree.

We begin with the standard of review and legal principles relevant to this claim. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend[s] to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . .

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be

admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . Reversal is required only [if] an abuse of discretion is manifest or [if an] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Gray-Brown*, 188 Conn. App. 446, 460–61, 204 A.3d 1161, cert. denied, 331 Conn. 922, 2015 A.3d 568 (2019).

"When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [A] nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict. . . . [O]ur determination [of whether] the defendant was harmed by the trial court's . . . [evidentiary ruling] is guided by the various factors that we have articulated as relevant [to] the inquiry of evidentiary harmlessness . . . such as the importance of the . . . testimony in the [state's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony . . . on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the [state's] case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Grant*, 179 Conn. App. 81, 90, 178 A.3d 437, cert. denied, 328 Conn. 910, 178 A.3d 1042 (2018).

The following additional facts and procedural history are relevant to this claim. During trial, Reeder testified that no gun was recovered and that the bullet fragment removed from the victim was not suitable for ballistics analysis. Reeder did testify, however, that the victim's wound was consistent with its having been made by a bullet fired from a small caliber weapon.[9]

During Reeder's testimony, the state sought to introduce into evidence two spent .22 shell casings found in the defendant's house two days after the shooting and argued that it had laid a foundation sufficient for their admission. In support of its proffer, the state pointed to Thompson's statement that the defendant owned a .22 or .25 caliber gun and that the defendant had told Thompson that he gave Mathis the gun. The state also argued that these casings were relevant on the basis of Reeder's statement that a firearm of the kind the defendant allegedly possessed would eject a casing, yet no casings were found at the scene of the crime.

Defense counsel objected to the admission of the shell casings, arguing that there was nothing to tie them to the crime, other than the statement by Thompson that he had seen the defendant with a .22 or .25 caliber gun. He further argued that because no evidence had

been presented as to when the casings were fired, they could have been fired years before the commission of the crime.

After hearing both parties, the court allowed the casings to be admitted as an exhibit, stating: "[R]obbery in the first degree and the conspiracy to commit robbery in the first degree . . . [require the state] to prove beyond a reasonable doubt . . . that the individual or any individual who participated in the crime was armed with a deadly weapon. Certainly the possession of casings in the defendant's home would be relative to the issue of whether or not the defendant may have possessed or had access to a firearm. . . . I've considered the fact that the testimony not only on direct and on cross-examination has discussed the issue of the type of gun that may have been used in this incident as well as the statement that has just come in with regard to witness Thompson addresses the issue of a revolver, specifically a low caliber revolver. . . . I am going to allow the admissibility of those casings, and allow those introduced into evidence through this witness."

Thereafter, Reeder resumed testifying and read a statement Thompson made to the police on May 23, 2014.[10] Thompson stated in relevant part: "[The defendant] told me he gave [Mathis] his gun. I had seen [the defendant] with this gun before. It is a revolver, a little .22 or maybe a .25." Reeder then testified that he executed a search warrant of the defendant's home on May 10, 2013, in search of "the stolen tablet, ammunition . . . firearms, [and] cellular phones." During the search, he found two .22 caliber shell casings in a "small closet or pantry at the backside of the kitchen . . . sitting on top of [a] shelf." At this point, the state introduced the casings as a full exhibit.

The defendant argues on appeal that because there was no connection between the shell casings and the shooting, the casings are impermissible evidence of the defendant's criminal propensity. "Evidence as to articles found in the possession of an accused person subsequent to the time of the commission of a crime for which he is being tried is admissible only if it tends to establish a fact in issue or to corroborate other direct evidence in the case; otherwise the law does not sanction the admission of evidence that the defendant possessed even instruments or articles adapted to the commission of other crimes. . . . The reason is analogous to that applicable to evidence of other crimes committed by a defendant but unrelated to the offense under investigation." *State* v. *Acklin*, 171 Conn. 105, 114, 368 A.2d 212 (1976) (concluding masks and ropes seized from defendants' car were unrelated to crime because "state offered no evidence to show that the defendants used the masks and rope in the commission of the robbery with which they were charged, or that they had contemplated their use in that robbery"); see

*State* v. *Girolamo*, 197 Conn. 201, 205–209, 496 A.2d 948 (1985) (court erred by admitting into evidence two automatic handguns seized at defendant's home that "ha[d] no direct relevance to the issues in the case"); *State* v. *Maner*, 147 Conn. App. 761, 768–69, 83 A.3d 1182 (trial court abused its discretion by admitting into evidence firearm determined not to be firearm used in crime charged), cert. denied, 311 Conn. 935, 88 A.3d 550 (2014); *State* v. *Llera*, 114 Conn. App. 337, 339, 969 A.2d 225 (2009) (trial court erred by allowing testimony about defendant's possession of Glock handgun when weapon used in crime charged was Lugar handgun).

The cases identified by the defendant, however, are distinguishable from the present case. In *Maner* and *Llera*, this court concluded that the trial court abused its discretion in admitting guns that were found in the respective defendants' possession because the guns were not the weapons used in the commission of the crime charged. In *Acklin* and *Girolamo*, the court determined that there was no evidence connecting the exhibits to the crimes charged. In the present case, forensic scientists were unable to determine the type of gun used in the shooting, but their testimony did not rule out the use of a small caliber gun in the commission of the crime. Additionally, in the present case, the state introduced evidence connecting the shell casings to the shooting death of the victim. The state introduced testimony that the shell casings came from a .22 caliber gun and Thompson's statement that he had seen the defendant with a .22 or .25 caliber gun. There was also testimony that the victim's wound was consistent with the type of wound created by a bullet fired from a small caliber gun.

Moreover, the casings are relevant to the crime charged because they show that the defendant had the means to commit the shooting. "Evidence indicating that an accused possessed an article with which the particular crime charged may have been accomplished is generally relevant to show that the accused had the means to commit the crime. The state does not have to connect a weapon directly to the defendant and the crime. It is necessary only that the weapon be suitable for the commission of the offense." (Emphasis omitted; citation omitted; internal quotation marks omitted.) *State* v. *Franklin*, 162 Conn. App. 78, 96, 129 A.3d 770 (2015) (testimony about defendant confronting witness with gun three weeks before shooting relevant because it indicated defendant had means to commit crime), cert. denied, 321 Conn. 905, 138 A.3d 281 (2016); see *State* v. *Gray-Brown*, supra, 188 Conn. App. 461–62 (empty nine millimeter Remington ammunition tray found in defendant's home was relevant to murder committed using nine millimeter bullets made by different manufacturer); *State* v. *VanAllen*, 140 Conn. App. 689, 696, 59 A.3d 888 (shell casings found at scene of shooting where defendant was present were relevant despite

lack of evidence of type of gun used), cert. denied, 308 Conn. 921, 62 A.3d 1134 (2013); *Langston* v. *Commissioner of Correction*, 104 Conn. App. 210, 217–18, 931 A.2d 967 (silencer found in defendant's home was relevant because it indicated defendant possessed gun), cert. denied, 284 Conn. 941, 937 A.2d 697 (2007).

Like the evidence in those cases, the shell casings in the present case indicate that the defendant had the means to commit the crime. The shooting was committed with a firearm, and there is evidence that the firearm used was a small caliber gun. Thus, the .22 caliber shell casings, which were found in the defendant's home, have a tendency to prove that the defendant owned a firearm and, therefore, that he had the means to commit a crime involving a small caliber gun. See, e.g., *Edward M.* v. *Commissioner of Correction*, 186 Conn. App. 754, 762–63, 201 A.3d 492 ("The well settled standard for relevance of evidence is extremely low. . . . [W]hether to give such evidence no weight, little weight or much weight, is up to the jury." [Citations omitted; internal quotation marks omitted.]), cert. denied, 305 Conn. 914, 46 A.3d 172 (2012).

On the basis of the foregoing, we conclude that the trial court did not abuse its discretion by admitting into evidence the spent shell casings.

IV

The defendant's final claim is that the trial court's instruction on conspiracy to commit robbery in the first degree was improper because it omitted the intent element required for the underlying crime of robbery in the first degree. The defendant argues that the court failed to instruct the jury that it had to find that he intended to commit a robbery while he or another participant was armed. We disagree.

The following additional facts and procedural history are relevant to this claim. After closing arguments, the court reviewed with counsel its proposed jury instructions, which it had provided to counsel two days earlier. When the court asked whether counsel approved of the instructions with regard to conspiracy to commit robbery in the first degree, defense counsel stated that they were acceptable. After going over the instructions, the court asked whether there was anything else counsel would like to discuss. Both counsel responded, "no." The court then inquired: "Does counsel need any more time to review these jury instructions except for the final copy that I will give to you?" Counsel responded that they did not require any additional time.

Thereafter, the court instructed the jury. The instruction on conspiracy to commit robbery in the first degree provided in relevant part: "The statute defining conspiracy reads in pertinent part as follows: A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more

persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . . The state must prove the following elements beyond a reasonable doubt: (1) the defendant intended to commit the crime of robbery in the first degree; (2) the defendant agreed with one or more persons to engage in or cause the performance of the crime of robbery in the first degree; [and] (3) the commission of an overt act in pursuance of the conspiracy, by any one or more of the persons who made the agreement."

With regard to the intent element of conspiracy to commit robbery in the first degree, the court further instructed: "The first element is that the defendant had the intent that conduct constituting [robbery in the first degree] be performed . . . . The defendant must be proven to have been [motivated] by criminal intent. The defendant may not be found guilty, unless the state has proven beyond a reasonable doubt that he had specific intent to violate the law, when he entered into an agreement to engage in the conduct constituting a crime. You are referred to the court's previous instructions on intent, which are incorporated here with the same force and effect."

On appeal, the defendant concedes that this claim was not raised at trial, but argues that it can be reviewed under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). The state argues that the defendant is not entitled to *Golding* review because he waived his claim regarding the jury instructions on conspiracy. We agree with the state that the defendant waived this claim.

"[A] constitutional claim that has been waived does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial." *State* v. *Kitchens*, 299 Conn. 447, 467, 482–83, 10 A.3d 942 (2011).

"[W]hen the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal. Such a determination by the reviewing court must be based on a close examination of the record and the particular facts and circumstances of each case. (Footnote omitted; internal quotation marks omitted.) *State* v. *Bellamy*, 323 Conn. 400, 409, 147 A.3d 655 (2016).

In the present case, the court provided counsel with a meaningful opportunity to review the instructions when it gave the parties a copy of the proposed jury instructions two days prior to instructing the jury. Thereafter, the court solicited comments from counsel regarding the proposed jury instructions. At this point, defense counsel did not express any concerns regarding the instructions on conspiracy to commit robbery in the first degree and stated that he did not need more time to review the proposed jury instructions. Moreover, defense counsel failed to object after the court instructed the jury on conspiracy. Thus, defense counsel had various opportunities to object to the instruction and failed to do so. Accordingly, we conclude that the defendant waived his instructional claim.

Alternatively, the defendant argues that his claim can be reviewed under the plain error doctrine. Although a *Kitchens* waiver does not preclude claims of plain error; see *State* v. *McClain*, 324 Conn. 802, 815, 155 A.3d 209 (2017); we disagree that the instruction was plain error.

We first note that plain error is a doctrine of reversibility, not reviewability. See *State* v. *Jamison*, 320 Conn. 589, 595–97, 134 A.3d 560 (2016). "It is well established that the plain error doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. . . . That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . This determination clearly requires a review of the plain error claim presented in light of the record.

"Although a complete record and an obvious error are prerequisites for plain error review, they are not,

of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . In *State* v. *Fagan*, [280 Conn. 69, 87, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L.Ed.2d 236 (2007)], [our Supreme Court] described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Jamison*, supra, 595–97. The standard of review relevant to claims of instructional error is set forth in part I of this opinion.

The defendant argues that the court committed plain error when it instructed the jury on conspiracy to commit robbery in the first degree because it failed to instruct the jury on the requisite intent. Contrary to this argument, the record reveals that the court instructed on the intent requirement for conspiracy to commit robbery in the first degree when it read from the conspiracy statute and set forth the elements of the crime. Indeed, the court provided the jury detailed instructions on the intent element of conspiracy to commit robbery in the first degree, which made clear that the intent required for the charge was the intent to commit the underlying crime of robbery in the first degree and referenced the immediately preceding five page charge on robbery in the first degree.

The defendant relies on our Supreme Court's decision in *State* v. *Pond*, 315 Conn. 451, 453, 108 A.3d 1083 (2015), in support of its argument that the court committed plain error by failing to adequately instruct on the intent requirement for conspiracy to commit robbery in the first degree. In *Pond*, the defendant appealed his conviction of conspiracy to commit robbery in the second degree in violation of General Statutes (Rev. to 2007) §§ 53a-135 (a) (2) and 53a-48 (a), claiming that the trial court improperly failed to instruct the jury that, to find the defendant guilty of the conspiracy charge, it must find that he specifically had intended that the planned robbery would involve the display or threatened use of what the defendant's coconspirator represented to be a deadly weapon or dangerous instrument. The instruction with which the defendant took issue began with a recitation of the conspiracy statute and then provided: "The third element is that the defendant has the intent to commit robbery in the second degree. The intent for that crime is that at the time of the agreement he intended to commit *larceny*." (Emphasis

added.) *State* v. *Pond*, supra, 456.

*Pond* is distinguishable from the present case. In *Pond*, the trial court improperly instructed the jury that the requisite intent for conspiracy to commit robbery in the second degree was intent to commit larceny, a crime that does not require that the defendant intended that a participant be armed. By contrast, in the present case, the court made clear that the defendant had to intend for a participant in the crime to use a deadly weapon when it stated that the intent required for conspiracy to commit robbery in the first degree is the intent to agree to commit the underlying crime of robbery in the first degree. Moreover, the court's instructions on robbery in the first degree, which it incorporated by reference into its instruction on conspiracy, provided that a participant in the crime had to be armed with a deadly weapon in order to find the defendant guilty of robbery in the first degree. The court's instruction on robbery in the first degree provided: "The second element of robbery in the first degree is that in the course of the commission of the crime of robbery, or immediate flight therefrom, the defendant, or another participant of the crime is armed with a deadly weapon." The court also instructed: "To be armed with a deadly weapon means to be knowingly *engaged with*, or knowingly carrying such an item." (Emphasis added; internal quotation marks omitted.) With regard to the term knowingly, the court provided: "An act is done knowingly if done voluntarily and purposely, and not because of mistake, inadvertence or accident. . . . The inference may be drawn if the circumstances are such that a reasonable person of honest intention, in the situation of the defendant, would have concluded that he, or another participant, was armed with a deadly weapon." (Internal quotation marks omitted.) Because the court's instruction informed the jury that it needed to find that the defendant intended that a participant in the crime be armed with a deadly weapon, we are unpersuaded that the court erred when it instructed the jury on conspiracy to commit robbery in the first degree, let alone that its instruction constituted plain error such that it would cause the public to lose faith in the judicial system or result in manifest injustice.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Neither the state nor the defendant requested that the court give an instruction on accessorial liability.

[2] This instruction was set forth on page 13 of the jury instructions.

[3] This instruction was set forth on page 15 of the jury instructions.

[4] This instruction was set forth on page 17 of the jury instructions.

[5] Although the note from the jury asked about the instruction in section (b) of page 15, the court clarified the language in section (c) of page 15. Both sections of the instructions, however, addressed the use of force element of robbery.

[6] In his brief, the defendant argues that the introduction of this theory was improper because it deprived him of the opportunity to argue against the theory at closing argument and, therefore, defend against the theory at

trial. At oral argument, however, the defendant stated "the issue here is not notice." Even if we assume that the defendant did not intend to concede the issue of notice, we conclude that the defendant was on notice of his potential liability for the acts of Mathis.

The allegations in the information provided notice to the defendant that he could be found liable for Mathis' acts. The information, in charging the defendant with robbery in the first degree, alleged that the defendant was liable because "he *or another participant in the crime* was armed with a deadly weapon" while in the course of the commission of a robbery and immediate flight therefrom. (Emphasis added.) Additionally, throughout trial, the state's theory was that the defendant was a participant in the crime, even though he might not have been the one who shot the victim. Thereafter, during closing argument, the state made clear that it was arguing that the defendant might not have been the shooter, but that he was a participant in the crime. Moreover, our case law makes clear that "a defendant, charged with an offense, is on notice that he may be convicted as an accessory to that offense." *State* v. *Walton*, 34 Conn. App. 223, 230, 641 A.2d 391, cert. denied, 230 Conn. 902, 644 A.2d 916 (1994).

[7] The court stated: "You *may consider* another participant of the crime. So the language would enable you to *consider*, *if* you find that the defendant or another participant of the crime used physical force . . . in committing a larceny you must then *determine whether* such physical force was used . . . ." (Emphasis added.)

[8] The defendant also argues that he was prejudiced by the court's error. Although we conclude that the court did not err in providing the jury with the supplemental instruction, even if we assume, arguendo, that it did, any error was harmless given the strength of the evidence against the defendant.

[9] As part of this claim that the testimony was inadmissable, the defendant, with respect to Reeder's testimony that the victim's gunshot wound was consistent with having been being caused by a bullet from a small caliber weapon, refers to the fact that Reeder was not qualified as a ballistics expert. Although Reeder was not qualified as a ballistics expert, the defendant failed to timely object to this testimony and, therefore, this argument is not reviewable on appeal. *State* v. *Fernando*, 331 Conn. 201, 211–12, 202 A.3d 350 (2019).

[10] The court admitted Thompson's statement for substantive purposes as a prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct 597, 93 L. Ed. 2d 598 (1986).